## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**BRIDGET HATTY**

      **Plaintiff,**

   **v.**

**CHILDREN'S INTERNATIONAL, L.L.C.**

     **Defendant.**

**CIVIL NO. 2:21-CV-609**

## COMPLAINT

Plaintiff Bridget Hatty asserts her causes of action against defendant Children's International, L.L.C. as follows:

### THE PARTIES

1.    Plaintiff is Bridget Hatty, a person of age and majority, a Louisiana citizen, and a resident of Slidell in St. Tammany Parish.

2.    Defendant is Children's International, L.L.C. ("CI"), a domestic limited liability company organized, headquartered, registered, and actively doing business in Louisiana, with its headquarters located in Slidell, Louisiana.

3.    Upon information and belief, CI has two managing members, Heidi B. Hernandez and Eduardo J. Hernandez, both of whom upon information and belief are Louisiana citizens.

### JURISDICTION AND VENUE

4.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question); 42 U.S.C. § 2000e-2 et seq. (Title VII); 42 U.S.C. § 2000e-3 et seq. (Title VII's anti-retaliation provision); 29 U.S.C. § 206(d) (Equal Pay Act ("EPA")); 29 U.S.C. § 2601 et seq. (Family and Medical Leave Act ("FMLA")), and 29 U.S.C. § 201 et seq. (Fair Labor Standards Act ("FLSA")), as more particularly set-out herein.

5.     The Court has supplemental, subject-matter jurisdiction over Ms. Hatty's Louisiana state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to her federal law claims that they form part of the same case or controversy as more particularly set-out herein.

6.     The Court has personal jurisdiction over CI because it is a domestic limited liability company organized in Louisiana, headquartered in St. Tammany Parish, and registered and actively doing business in Louisiana, and, through its registered agents for service of process, is present within Louisiana at the time this suit commenced.

7.     Venue for Ms. Hatty's Title VII claims are proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3) because the alleged discriminatory employment practices occurred within this forum (specifically St. Tammany Parish), and Ms. Hatty would have continued to have been employed in this forum but for the discriminatory employment actions at issue in this case.

8.     Venue for Ms. Hatty's EPA, FMLA, FLSA, and supplemental, state-law claims are proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because CI is a limited liability company subject to personal jurisdiction within Louisiana at the time this lawsuit commenced and, under Section 1391(c)(2), has sufficient contact with this judicial district to impose personal jurisdiction if this district were a separate state.

9.     Alternatively, venue for Ms. Hatty's EPA, FMLA, FLSA, and supplemental, state-law claims are proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because CI employed Ms. Hatty within this judicial district (specifically, St. Tammany Parish), CI executed its discrimination against and actually terminated Ms. Hatty's employment from within this judicial district (same), and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district (same).

## PROCEDURAL AND STATUTORY REQUIREMENTS

10.     At all relevant times in this case, CI employed more than 100 full-time employees.

11.     On or about April 17, 2018, CI hired Ms. Hatty as a full-time, hourly employee in the position of Marketing Associate.

12.     On or about June 3, 2020, CI terminated Ms. Hatty's employment.

13.     The decision makers who actually terminated Ms. Hatty's employment were Brittany Frost and Dr. Eduardo Hernandez.

14.     Upon information and belief, CI terminated Ms. Hatty's employment because of her sex (woman) and in retaliation for lodging protected complaints with management regarding unlawful sex-based discrimination and pay disparity (Title VII, LEDL, and the EPA).

15.     Additionally, or alternatively, upon information and belief, CI unlawfully and intentionally discriminated against Ms. Hatty because of her sex (woman) by creating a sex and sexual-based hostile work environment (Title VII and LEDL), replacing her with a man (Title VII and LEDL), and by paying her significantly less wages than her male predecessors and her current, male comparator (EPA).

16.     Additionally, or alternatively, upon information and belief, CI unlawfully and intentionally interfered with Ms. Hatty's rights under the FMLA by refusing to reinstate her to her former position or a substantially equivalent position after Ms. Hatty returned from FMLA leave (FMLA).

17.     Additionally, or alternatively, upon information and belief, CI unlawfully and intentionally failed to pay Ms. Hatty overtime wages she was due for working more than 40 hours during any given workweek (FLSA).

18.     On or about January 2, 2021, within 300 days of her termination and last adverse employment action, Ms. Hatty timely filed an EEOC Charge of Discrimination with the EEOC

New Orleans Field Office (which, because of work-sharing agreement with the Louisiana Commission on Human Rights, was automatically accepted for filing with the LCHR, terminated, and referred to the EEOC for processing) alleging that CI unlawfully discriminated against and terminated Ms. Hatty in violation of Title VII, the FLSA, the EPA, and the FMLA and stating additional facts describing the nature of and giving rise to CI's retaliation against Ms. Hatty for making these protected complaints  (EEOC Charge No. 461-2021-00620).

19.     On February 10, 2021, the EEOC issued Ms. Hatty a Notice of Right to Sue in this matter.

20.     Ms. Hatty timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.     The Plaintiff – Bridget Hatty**

21.     Bridget Hatty is a 37-year-old single mother who lives with and cares for her daughter in Slidell, Louisiana.

22.     On April 17, 2018, CI hired Ms. Hatty as an hourly employee in the position of Marketing Associate earning approximately $13.50 per hour.

23.     Around August 2019, CI promoted Ms. Hatty to the position of Director of Marketing and Public Relations earning approximately $17.10 per hour.

24.     CI terminated Ms. Hatty's employment on or about June 3, 2020.

**B.     The Defendant – Children's International, L.L.C.**

25.     CI is a limited liability company organized in Louisiana and headquartered in Slidell.

26.     CI is in the business of owning, operating, and managing over twenty (20) medical clinics throughout Louisiana and Mississippi.

27.     CI maintains an administrative office and headquarters in Slidell, Louisiana, and this office

is where Ms. Hatty was continuously employed and assigned since April 2018.

28.    Upon information and belief, CI has two managing members, Heidi B. Hernandez and Eduardo J. Hernandez.

29.    At all times relevant to this lawsuit, including at the time of Ms. Hatty's termination, Ms. Hatty's immediate supervisor was Brittany Frost, CI's Chief Business Officer and Human Resources Manager.

30.    At all times relevant to this lawsuit, including at the time of Ms. Hatty's termination, Ms. Hatty's second level supervisor and final decision-maker was Dr. Eduardo Hernandez, the Managing Member of CI.

31.    Both Ms. Frost and Dr. Hernandez possessed the authority to discipline Ms. Hatty and terminate her employment.

32.    Upon information and belief, Ms. Frost and Dr. Hernandez did, in fact, terminate Ms. Hatty's employment on June 3, 2020.

**C.    CI and Brittany Frost Subjected Ms. Hatty to a Sexual Harassing and Sex-Based Hostile Work Environment**

33.    During Ms. Hatty's employment, beginning around September or October 2019 and continuing through around February 2020, she was routinely, sexually harassed by a male coworker BI.[1]

34.    BI routinely made romantic advances towards Ms. Hatty during this time period, inappropriately flirted with her, and used suggestive language with her during professional work hours, despite Ms. Hatty's consistent statements that the advances and flirtation were inappropriate and unwelcome.

---

[1] Plaintiff refers to her harasser in this publicly filed document using only his initials. Plaintiff will supplement with the full name of each person identified by initials during discovery.

35.    Ms. Hatty complained about BI's behavior during this time period to MP, the Chief Operating Officer of CI, and Brittany Frost, CI's human resources manager.

36.    MP, although sympathetic, refused to take action on Ms. Hatty's complaint, stating that CI management would not take action against BI because he was related to the Hernandez family, and because MP opined that harassment claims "do not play out well for women."  Upon information and belief, Ms. Frost did not intervene in any meaningful way to stop BI's misconduct.

37.    Eventually, BI began retaliating against Ms. Hatty for refusing his advances.

38.    To the best of Ms. Hatty's recollection, starting around October 2019, BI began to demand management reassign Ms. Hatty's job responsibilities to him.

39.    Upon information and belief, the reason BI made these demands was in retaliation against Ms. Hatty for rebuffing his advances, and for the ultimate purpose of minimizing Ms. Hatty's employment and responsibilities at CI.

40.    Ms. Hatty complained to Ms. Frost on multiple occasions regarding BI's attempts to minimize and reassign Ms. Hatty's job responsibilities, but Ms. Frost did nothing to stop the behavior.

41.    Upon information and belief, despite the fact that BI's misbehavior was well known throughout CI management, no one in CI's management took any corrective action against BI to protect Ms. Hatty or end the hostile work environment BI created, and BI was never disciplined, warned, or admonished in any capacity.

42.    Separate and apart, Ms. Frost routinely criticized Ms. Hatty's work without cause, failed to recognize Ms. Hatty's excellent work product, reassigned Ms. Hatty's responsibilities to men without cause, and treated Ms. Hatty poorly to the extent that she had no reasonable likelihood of success in her position of Director of Marketing and Public Relations.

43.     Ms. Frost did not, however, criticize the similar work of ZA (a male comparator who formerly held the same positions as Ms. Hatty) or BI, refuse to recognize their work, reassign their responsibilities to others, or treat them poorly under similar or identical circumstances.

44.     Upon information and belief, Ms. Frost created and fostered this hostile work environment against Ms. Hatty based on her sex, including Ms. Frost's refusal to protect Ms. Hatty from the sexual harassment of BI, because Ms. Frost held animus against Ms. Hatty specifically because she is a woman.

45.     Stated another way, if Ms. Hatty were a man, Ms. Frost would not have created the hostile work environment alleged throughout this complaint against her, and would not have condoned similar mistreatment against her.

**D.     CI Paid Ms. Hatty Significantly Less Than Her Male Predecessor and Current, Male Comparator**

46.     Ms. Hatty learned that her male predecessor and current male comparator were paid significantly more than her, despite the fact that Ms. Hatty (1) held a job title higher in grade than her male counterparts (Ms. Hatty was the Director of Marketing and Public Relations, while her immediate predecessor held the title, during the comparison period, of merely Director of Marketing), (2) performed the entirety of her predecessor's marketing job responsibilities during the comparison period; and (3) was actually given greater responsibilities than her predecessor during the comparison period relative to additional public relationships work.

47.     Nevertheless, at the time of her termination, Ms. Hatty was earning approximately $17.10 per hour for a yearly equivalent of approximately $33,000.

48.     In contrast, Ms. Hatty's immediate predecessor, ZA, a man, held the position of Director of Marketing during the comparison period and, upon information and belief, was paid an actual salary of approximately $80,000.

7

49.     Upon information and belief, Ms. Hatty's harasser and current comparator in this case, BI, also earns significantly more than Ms. Hatty even though he replaced Ms. Hatty after her termination.

50.     Upon information and belief, CI purposefully paid Ms. Hatty significantly less than her male comparators for similar work and in identical or functionally identical job positions because CI decision-makers held animus against Ms. Hatty because she is a woman.

51.     Stated another way, if Ms. Hatty were a man, CI would have paid her approximately similar wages or salary compared to her male comparators for the same work and in identical or functionally identical positions.

**E.     Ms. Hatty was an Hourly Worker but Never Received Overtime Pay**

52.     During the entirety of her employment, CI paid Ms. Hatty by the hour, not on a salary basis.

53.     CI periodically gave Ms. Hatty raises in terms of hourly rate, such as raises of $1/hour.

54.     At the time of her termination, CI paid Ms. Hatty approximately $17.10 per hour.

55.     During Ms. Hatty's employment, she was required to clock in and clock out every day to allow CI to track her hours of work.

56.     Upon information and belief, Ms. Hatty averaged forty-five (45) hours of work every week that she was employed with CI, for an average of five (5) overtime work hours every week, totaling approximately 555 hours of total overtime during Ms. Hatty's employment with CI.

57.     CI never paid Ms. Hatty overtime wages for the weeks in which she worked an excess of 40 hours.

58.     Moreover, in her jobs of Marketing Associate and Director of Marketing and Public Relations, while Ms. Hatty exercised significant skill attendant to her professional marketing and public relations duties, Ms. Hatty was not authorized to, and did not, create management policies

at CI, affect CI's business operations to a substantial degree, commit CI to financial obligations without prior approval from management, deviate from existing CI policies without prior approval from management, and so on and so forth.

59.     Stated another way, in both her jobs of Marketing Associate and Director of Marketing and Public Relations, Ms. Hatty performed very skilled work, but CI decision-makers did not consider Ms. Hatty, either organizationally or practically, as a member of management or a person authorized to use discretion on matters of significant importance or concern to the business.

60.     Upon information and belief, CI knew that Ms. Hatty was entitled to overtime wages as an hourly employee, but intentionally refused to pay her those wages.

61.     Additionally, CI required Ms. Hatty to clock in and out of work using an online, cloud-based payroll and time keeping service called "Paylocity."

62.     When CI terminated Ms. Hatty's employment, CI management restricted Ms. Hatty from accessing her hourly timecard records from Paylocity.

63.     After Ms. Hatty's termination, Ms. Hatty requested that Ms. Frost grant her access to her hourly timecards via the Paylocity service.

64.     Eventually Ms. Frost granted the access.

65.     When Ms. Hatty accessed her timecard records, she discovered that all her timecard entries reflected that she worked exactly 40 hours per week, every week, since her employment began.

66.     To best of Ms. Hatty's recollection, there were few, if any, weekly pay periods in which Ms. Hatty entered exactly 40 hours of work per week.

67.     Accordingly, upon information and belief, based upon the totality of circumstances as Ms. Hatty appreciates them at present, CI management purposefully spoliated Ms. Hatty's timecard records after her termination for the purpose of covering up that Ms. Hatty usually worked more

than 40 hours per week.

68.     Alternatively, upon information and belief, based upon the totality of circumstances as Ms. Hatty appreciates them at present, CI management, either before or after her termination, consistently altered Ms. Hatty's timecard records during her employment for the purpose of covering up that Ms. Hatty usually worked more than 40 hours per week.

69.     Finally, upon information and belief, CI purposefully refused to pay Ms. Hatty the overtime wages she was due because CI decision-makers held animus against Ms. Hatty because she is a woman.

70.     Stated another way, if Ms. Hatty were a man, CI would have paid her the overtime wages she was due.

**F.     Ms. Hatty Contracts COVID-19 and CI Constructively Demotes Her After Returning from Medical Leave**

71.     In March 2020, Ms. Hatty apparently contracted COVID-19 and developed pneumonia and a partial collapse of her right lung.

72.     At the same time, Ms. Hatty's daughter also apparently contracted COVID-19.

73.     Ms. Hatty alerted CI to her and her daughter's serious health conditions, and ultimately requested two weeks of medical leave to recover and care for her daughter.

74.     Dr. Hernandez concurred and granted Ms. Hatty two weeks of medical leave.

75.     After Ms. Hatty's two weeks of leave expired, CI management granted Ms. Hatty permission to work from home for an additional week.

76.     On or about April 20, Ms. Hatty returned to work full time at CI's Slidell headquarters.

77.     However, during Ms. Hatty's approved medical leave, CI management (upon information and belief Brittany Frost) reassigned Ms. Hatty's job responsibilities to BI.

78.     When Ms. Hatty returned to work, Ms. Frost refused to reassign virtually any of Ms.

Hatty's former responsibilities back to her, and for all practical purposes replaced Ms. Hatty with BI in the Director of Marketing and Public Relations position.

79.     Instead, Ms. Frost demanded that Ms. Hatty perform manual labor and cleaning jobs when she returned to work, including cleaning the office, running errands, and getting lunch for Ms. Frost.

80.     Prior to taking approved medical leave, Ms. Hatty had never been required to perform those sorts of manual labor, cleaning, and personal tasks as either a Marketing Associate or Director of Marketing and Public Relations.

81.     Accordingly, based upon the totality of the circumstances, CI management and Ms. Frost constructively demoted Ms. Hatty to an unspecific position during her approved medical leave and upon her return to work.

82.     Ms. Hatty asked to be returned to her to her previous job responsibilities, but Ms. Frost mostly refused to do so.

83.     CI never reinstated Ms. Hatty to her former position, or to any other substantially equivalent position, before her termination on June 3, 2020.

84.     Finally, upon information and belief, CI purposefully refused to reinstate Ms. Hatty to her prior position or a substantially equivalent position after she returned from medical leave because CI decision-makers held animus against Ms. Hatty because she is a woman.

85.     Stated another way, if Ms. Hatty were a man, CI would have reinstated her to her prior job position after she returned from medical leave.

**G.     Ms. Hatty Requests a Formal Meeting with Ms. Frost to Make Protected Complaints**

86.     In the wake of these and other issues of mistreatment at CI, Ms. Hatty requested a formal in person meeting with Ms. Frost to formally complain about the ongoing sex-based

discrimination, sex-based pay disparity, harassment, hostile work environment, and constructive demotion after returning from approved medical leave.

87.     Ms. Frost agreed to meet with Ms. Hatty on the morning of June 3, 2020.

88.     Out of an abundance of caution, and to protect herself from what Ms. Hatty perceived as continually hostile management, Ms. Hatty recorded her entire in-person meeting with Ms. Frost in Ms. Frost's office at CI's Slidell headquarters.

89.     Ms. Hatty met with Ms. Frost in the early morning of work on June 3, 2020.

90.     During that meeting, Ms. Hatty formally complained to Ms. Frost that (1) CI management treated others (in context, men) preferably to Ms. Hatty; (2) CI management replaced Ms. Hatty in her position with BI (a man); (3) and CI management paid BI and ZA (both men) more than Ms. Hatty for the same job.

91.     Ms. Frost became hostile during the meeting, told Ms. Hatty that she would discuss the complaints with Dr. Hernandez, and then dismissed Ms. Hatty from the meeting.

**H.     Ms. Frost Terminates Ms. Hatty's Employment Four Hours Later in Retaliation Against Her Because Ms. Hatty Made Protected Complaints**

92.     Ms. Frost summoned Ms. Hatty back to her office for another meeting four hours later.

93.     Ms. Hatty again recorded this in-person meeting with Ms. Frost.

94.     Ms. Frost told Ms. Hatty that she spoke with Dr. Hernandez, and that CI terminated Ms. Hatty's employment effective immediately.

95.     Ms. Frost impliedly admitted that CI terminated Ms. Hatty's employment based on Ms. Hatty's complaints four hours earlier, specifically that "I think it would be best for you to go, for us to let you go," and "we just see things so differently, I don't see how I would fix something that I don't think is there."

96.     In response, Ms. Hatty accused management of terminating her "because I said I have a

problem with the way I'm getting treated."

97.     Ms. Frost denied the allegation but offered no other explanation whatsoever—non-pretextual or otherwise—justifying management's immediate termination decision other than Ms. Hatty's protected complaints four hours earlier.

98.     Ms. Frost further admitted that Ms. Hatty was not terminated for poor performance, telling Ms. Hatty that Ms. Frost believed she "did good at her job."

99.     Thereafter, Ms. Frost ordered Ms. Hatty to pack her belongings and leave CI's property.

100.    Additionally or alternatively to Ms. Frost's retaliatory animus, upon information and belief, CI terminated Ms. Hatty's employment because CI decision-makers held animus against Ms. Hatty because she is a woman.

101.    Stated another way, if Ms. Hatty were a man, CI would not have terminated her employment.

## I.     The Aftermath

102.    Because of CI's unlawful pay-disparity decisions, Ms. Hatty has suffered lost differential wages between the actual wages she was paid during her employment with CI compared to the wages or salary CI should have paid Ms. Hatty based on the wages and salary CI paid Ms. Hatty's male comparators.

103.    Because of CI's unlawful termination decision, Ms. Hatty has suffered lost wages and benefits including medical insurance and will likely continue to accrue lost wages into the future.

104.    Because of CI's unlawful termination decision and the prior hostile work environment and harassment CI permitted to continue, Ms. Hatty has suffered emotional distress, mental anguish, fear, and loss of enjoyment of life specifically related (but not limited) to Ms. Hatty's loss of employment and income during a global pandemic while caring for herself and her daughter.

## CAUSES OF ACTION

**A.**   **Unlawful Disparate Treatment Discrimination and Hostile Work Environment Based on Sex under Title VII against CI**

105.   Ms. Hatty states a cause of action for unlawful disparate-treatment discrimination and hostile work environment based on her sex (woman) against CI under Title VII.

106.   Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color . . . sex, or national origin[.]" 42 U.S.C. §2000e-2(a)(1).   An employer illegally demotes, terminates, or constructively discharges an employee based on his protected status when the status is at least one of the factors motivating the adverse action. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).   In a Title VII action, an employer is vicariously liable for its decision-maker's discriminatory acts when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action.   *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr*., 876 F.2d 1231, 1235 (5th Cir. 1989).

107.   Title VII also prohibits the creation of a sex-based, hostile work environment.   *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (so holding).   A work environment becomes "hostile" as a matter of law when discrimination "destroys a protected classmember's opportunity to succeed in the work place[,]" *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999), or when the harassment "detract[s] from employees' job performance, discourage[s] employees from remaining on the job, or keep[s] them from advancing in their careers.   *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993).

108.   Relatedly, Title VII prohibits status-based harassment that is "severe or pervasive [enough] to alter the conditions of the victim's employment and create an abusive working environment."

*Stewart v. Miss. Transp. Commission*, 586 F.3d 321, 328 (5th Cir. 2009).  A plaintiff states a prima facie case for status-based hostile work environment by showing "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome harassment; (3) that harassment was based on [that status]; (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action." *Lopez v. Kempthorne*, 684 F.Supp.2d 827, 858–59 (S.D. Tex. 2010).

109.    In this case, as alleged throughout this complaint, Ms. Hatty alleges that CI and its decision-makers took the following adverse and tangible employment actions and other acts, all of which cumulatively crated a continuing, adverse, and tangible hostile work environment against Ms. Hatty, because she is a woman:

    a.    Paid Ms. Hatty significantly less compared to her male comparators for identical work in identical or functionally identical job positions;

    b.    Refused to pay Ms. Hatty the overtime hours she was due for the work she performed;

    c.    Refused to protect Ms. Hatty from BI's sexual harassment after Ms. Hatty complained to management;

    d.    Criticized Ms. Hatty's work without cause, refused to credit Ms. Hatty for her excellent work, and treated Ms. Hatty poorly compared to her male comparators under similar circumstances to such a degree that Ms. Hatty's ability to succeed in her position of Director of Marketing and Public Relations was destroyed;

    e.    Replaced Ms. Hatty with a man while she was on permitted medical leave and then refused to reinstate her to her former position or a substantially equivalent position

when she returned;

f.      Retaliated against Ms. Hatty when she blew the whistle to management regarding what Ms. Hatty perceived as potential violations of state and federal law related to CI's expansion of its rural medicine business; and,

g.      Terminated Ms. Hatty's employment after she made protected complaints to Brittany Frost on June 3, 2020.

110.    Further, as alleged throughout this complaint, a primary discriminator and retaliator was Ms. Frost, who herself was CI's human resources manager, and who upon information and belief knew that both her and CI's employment actions were unlawful under both federal and state law, but who persisted in her unlawful course of conduct anyway, such that plaintiff asserts CI owes Ms. Hatty punitive damages up to the Title VII statutory cap.

111.    Accordingly, CI is liable, both directly and vicariously through its owners, managers, and employees, for all actual and statutory damages suffered by Ms. Hatty resulting from the adverse employment actions, wrongful termination, and hostile work environment she suffered, including, but not limited to, back pay, front pay or reinstatement, compensatory damages, non-compensatory damages, mental anguish, emotional distress, loss of enjoyment of life, out-of-pocket expenses, legal costs, pre-judgment and post-judgment interest, punitive damages up to the Title VII statutory cap, Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**B.      Unlawful Disparate Treatment Discrimination and Hostile Work Environment Based on Sex under the LEDL against CI**

112.    Ms. Hatty states a cause of action for unlawful disparate-treatment discrimination and hostile work environment based on her sex (woman) against CI under the Louisiana Employment Discrimination Law ("LEDL").

16

113.    Under the LEDL, no employer may discriminate against an employee based on her sex. La. Rev. Stat. Ann. § 23:332 *et seq.*   Louisiana's employment anti-discrimination statute is modeled after Title VII, and therefore analysis under the two statutes is functionally identical.  *See e.g.*, *Alderman v. Great Atl. & Pac. Tea Co.*, Inc., 332 F.Supp.2d 932, 936 (E.D. La. 2004) (noting "[b]ecause of its doctrinal similarity to Title VII, and the related social goals of both statutes, Louisiana courts routinely look to Title VII to interpret the LEDL").

114.    Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment discrimination and hostile work environment under Title VII against CI, CI's conduct likewise violates the LEDL, and CI is liable to Ms. Hatty for all her damages arising from CI's unlawful discrimination and hostile work environment, including but not limited to back pay, front pay or reinstatement, compensatory damages, non-compensatory damages, Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**C.**    **Unlawful Disparate Treatment Discrimination Based on Retaliation under Title VII against CI**

115.    Ms. Hatty states a cause of action for unlawful disparate-treatment discrimination based on retaliation against CI under Title VII.

116.    Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee because of her sex.  42 U.S.C. §2000e-2(a)(1).  Title VII also prohibits an employer from retaliating against an employee for making a protected complaint of discrimination under Title VII.  42 U.S.C. §2000e-3(a).

117.    Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against an employee "because he has opposed any practice made an unlawful employment practice under [Title VII], or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. §2000e-3(a). In a retaliation case, "an adverse employment action is one that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006)). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 562 (5th Cir. 2007) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). Just as in a Title VII discrimination case, an employer remains vicariously liable for the acts of its decision-maker when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

118.    In this case, Ms. Hatty made several informal and formal complaints to CI management, including Ms. Frost and chief operating officer MP, regarding the sexual harassment perpetrated by BI and sex-based discrimination and hostile work environment perpetrated by Ms. Frost and CI management. Upon information and belief, CI management refused to intervene to protect Ms. Hatty or prevent future harassment and discrimination, and in fact actively discouraged Ms. Hatty from making further complaints or allegations of misconduct.

119.    Further, when Ms. Hatty formally complained to Ms. Frost on June 3, 2020 that management treated Ms. Hatty treated less favorably than her male comparators, was paid less than her male colleagues for identical work, and had been replaced in her job by a man, Ms. Frost and Dr. Hernandez retaliated by immediately terminating Ms. Hatty's employment, and tacitly

admitted doing so for that reason.

120.     Upon information and belief, CI management terminated Ms. Hatty specifically because of her protected complaints.  Stated another way, had Ms. Hatty not complained, management would not have terminated her employment.

121.     Additionally, as alleged above, Ms. Frost herself was the chief human resources office of CI and therefore must have known that management's termination decision was unlawful under federal and state law, but she and CI persisted in their course of conduct anyway, and in the full scope of their employment responsibilities at CI.

122.     Accordingly, CI is liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Ms. Hatty resulting from her unlawful and retaliatory termination, including, but not limited to, back pay, front pay or reinstatement, compensatory damages, non-compensatory damages, mental anguish, emotional distress, loss of enjoyment of life, out-of-pocket expenses, legal costs, pre-judgment and post-judgment interest, punitive damages up to the Title VII statutory cap, Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**D.     Unlawful Disparate Treatment Discrimination Based on Retaliation under the LEDL (as Amended) against CI**

123.     Ms. Hatty states a cause of action of unlawful disparate treatment discrimination based on retaliation under the LEDL and La. Rev. Stat. Ann. § 51:2256 *et seq.* against CI.

124.     Under the LEDL, no employer may discriminate against an employee based on her sex. La. Rev. Stat. Ann. § 23:332 *et seq.*  Likewise, under La. Rev. Stat. Ann. § 51:2256 *et seq.*, no employer may "retaliate . . . in any manner against a person because he has opposed a practice declared unlawful under [the LEDL]."  Louisiana's employment anti-discrimination statute is

modeled after Title VII, and therefore analysis under the two statutes is functionally identical.  *See e.g.*, *Alderman v. Great Atl. & Pac. Tea Co.*, Inc., 332 F.Supp.2d 932, 936 (E.D. La. 2004) (noting "[b]ecause of its doctrinal similarity to Title VII, and the related social goals of both statutes, Louisiana courts routinely look to Title VII to interpret the LEDL").

125.     Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate treatment retaliation under Title VII against CI, CI's conduct likewise violates the LEDL and Section 51:2256, and CI is liable to Ms. Hatty for all her damages arising from CI's unlawful retaliation, including but not limited to back pay, front pay or reinstatement, compensatory damages, non-compensatory damages, Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**E.      Sex-Based Pay Disparity in Violation of the Equal Pay Act against CI**

126.     Ms. Hatty states a cause of action for unlawful sex-based pay disparity against CI under the Equal Pay Act.

127.     The Equal Pay Act is a component of the Fair Labor Standards Act and prohibits an employer from paying a woman less than a man for equal work.  29 U.S.C. § 206(d)(1).  A plaintiff establishes a prima facie case for pay-disparity under the EPA by showing "she held the same position as [a man] did . . . and that she was paid less than they were."  *Lindsley v. TRT Holdings, Inc.*, 984 F.3d 460, 467 (5th Cir. 2021).  Alternatively, a plaintiff establishes a prima facie case by showing "1) the defendant is an employer that is subject to the Equal Pay Act; 2) the plaintiff worked 'in a position requiring equal skill, effort, and responsibility under similar working conditions'; and 3) that the defendant paid the plaintiff 'less than the employee of the opposite sex providing the basis for the comparison.'"  *Herster v. Bd. of Supervisors of Louisiana State Univ.*,

72 F.Supp.3d 627, 640 (M.D. La. 2014) (citing *Phillips v. TXU Corp.*, 194 Fed. Appx. 221, 224 (5th Cir. 2006)).  An employer who willfully violates the EPA is liable to the plaintiff for up to three years of differential wages prior to the date the plaintiff commences suit.  29 U.S.C. § 255(a).  An employer who violates the EPA owes the plaintiff her back wages equal to the difference between the wages she was paid versus what the employer paid men for the same work.  *Schulte v. Wilson Indus., Inc.*, 547 F.Supp. 324, 343 (S.D. Tex. 1982).  An employer who willfully violates the EPA is also liable to the plaintiff for an additional award of liquidated damages equal to the amount of the back pay award.  29 U.S.C. § 216(b).

128.    In this case, Ms. Hatty was hired by CI in April 2018, and served as both a Marketing Associate and Director of Marketing and Public Relations.  Upon information and belief, Ms. Hatty's predecessor in her marketing roles was ZA, who held at one time the title of Director of Marketing.  Upon information and belief, CI actually hired Ms. Hatty as its Marketing Associate so that it could promote ZA from his Director of Marketing position to a new position.  Upon information and belief, when Ms. Hatty began her work as Marketing Associate, she performed the identical job duties as did ZA when he was Director of Marketing (Ms. Hatty's lesser job title, upon information and belief, was motivated by CI management's sex-based animus against Ms. Hatty because she was a woman).  Further, in August 2019, CI promoted Ms. Hatty to the position of Director of Marketing and Public Relations, which was the functionally identical position that ZA previously held as Director of Marketing (with the exception that Ms. Hatty, as the Director of Marketing ***and Public Relations***, held even greater responsibilities than did ZA).

129.    However, Chief Operating Officer MP later told Ms. Hatty that ZA was paid $80,000 per year in salary for the same marketing work that Ms. Hatty performed during her entire employment at CI.  Likewise, ZA personally told Ms. Hatty he was paid significantly more than her for identical

work.

130.     Likewise, CI replaced Ms. Hatty with BI (or effectively replaced Ms. Hatty with BI by assigning all of her responsibilities to him), and, upon information and belief, CI paid BI significantly more than it paid Ms. Hatty to perform her identical work.

131.     Upon information and belief, Ms. Frost, as CI's human resources manager, actually knew that CI's pay disparity violated the EPA, but Ms. Frost and CI persisted in their course of conduct anyway.

132.     Accordingly, CI is liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Ms. Hatty resulting from CI's unlawful pay disparity, including differential back pay equal to the wages or salary CI actually paid to Ms. Hatty's male comparators in this case, and an additional award of liquidated damages equal to the amount of that back pay award, along with Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**F.     Unlawful Disparate Treatment Discrimination Based on Retaliation Under the Equal Pay Act against CI**

133.     Ms. Hatty states a cause of action for unlawful retaliation for making protected complaints regarding sex-based pay disparity against CI under the Equal Pay Act.

134.     Because the EPA is a component of the FLSA, an employer is prohibited from retaliating against an employee for complaining about unequal pay.  29 U.S.C. § 215(a)(3).  A complaint may be made orally (as opposed to in writing) so long as the "recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). In the federal Fifth Circuit, a plaintiff lodges a protected complaint under the FLSA when "a reasonable employer [would] understand it, in light of both content and context, as an assertion of

rights protected by the [FLSA] and a call for their protection." *Starnes v. Wallace*, 849 F.3d 627, 632 (5th Cir. 2017).  An employer who terminates an employee in retaliation for her protected complaint under the FLSA remains liable for the employee's compensatory damages, including uncapped "compensation for emotional distress that is typically available for intentional torts like retaliatory discharge." *Pineda v. JTCH Apartments, L.L.C.*, 843 F.3d 1062, 1064 (5th Cir. 2016). *Pineda* also includes dicta suggesting that uncapped punitive damages are also available against an employer who willfully retaliates against an employee under the FLSA.  *Pineda*, 843 F.3d at 1064 (noting with approval that in the Seventh Circuit "[c]ompensation for emotional distress, and punitive damages, are appropriate for intentional torts such as retaliatory discharge").

135.    In this case, Ms. Hatty was terminated within four (4) hours of making a protected complaint to Ms. Frost on June 3, 2020 regarding the sex-based pay disparity.  Ms. Frost is the long-time human resources manager of CI.  Upon information and belief, Ms. Frost actually understood Ms. Hatty's complaint that ZA and BI were paid more than her in her same position, "in light of both content and context," as an assertion of a complaint under the Equal Pay Act and FLSA that CI was unlawfully paying men more than Ms. Hatty for identical work.  Ms. Frost became hostile immediately after Ms. Hatty made her complaint, told Ms. Hatty that Frost would discuss the matter with Dr. Hernandez, and then ended the meeting.  Upon information and belief, Ms. Frost did report all of Ms. Hatty's protected complaints to Dr. Hernandez, and together Frost and Hernandez decided to retaliate against Ms. Hatty for making the complaints by terminating her.  Then, four hours after Ms. Hatty's initial meeting with Frost, Ms. Frost summoned Ms. Hatty back to her office and summarily terminated her, tacitly admitting that the termination was in fact solely in retaliation against Ms. Hatty because of her protected complaints.

136.    Accordingly, CI is liable, both directly and vicariously through their owners, managers,

and employees, for all actual and statutory damages suffered by Ms. Hatty resulting from the retaliatory discharge, including lost back wages, lost front wages or reinstatement, an additional award of liquidated damages equal to the award of lost wages, compensatory damages, non-compensatory damages, and punitive damages, along with Ms. Hatty's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, legal and equitable relief.

**G.   Interference of Rights and Retaliation under the Family Medical Leave Act against CI**

137.   Ms. Hatty states a cause of action for unlawful interference of her rights and retaliation under the Family Medical Leave Act against CI.

138.   The Family and Medical Leave Act requires an employer to provide a covered employee with up to 12 weeks of medical leave in a 12-month period related to any serious health condition or because the employee is required to care for a child who suffers from a serious health condition, *see* 29 U.S.C. § 2612(a)(1)(C) *and* (D), and to reinstate the employee to her former position when she returns.  29 U.S.C. § 2614(a)(1)(A).  Likewise, an employer is prohibited from "interfer[ing] with . . . any right" under the FMLA.  29 U.S.C. § 2615(a) *et seq.*, or from retaliating against an employee who opposed or made protected complaints under the FMLA.  An employer who interferes with an employee's rights under the FMLA or retaliates against an employee for engaging in protected complaints under the FMLA owes the employee lost back wages, lost front wages, interest, an additional award of liquidated damages in the amount of the lost wage award, other equitable relief including reinstatement or promotion, and plaintiff's reasonable attorney's fees and litigation costs incurred in the matter.  29 U.S.C. § 2617(a)(1) *et seq.*

139.   Here, Ms. Hatty developed a serious health condition requiring treatment—specifically, pneumonia presumably stemming from her COVID-19 infection—and temporarily could not perform her duties.  Ms. Hatty's daughter also developed a serious health condition— presumably

stemming her COVID-19 infection—and Ms. Hatty was required to miss work to care for her daughter.  Ms. Hatty gave these facts to CI management; Dr. Hernandez concurred in Ms. Hatty's diagnosis; and CI management approved Ms. Hatty's two weeks of medical leave.  While away on leave, management re-assigned Ms. Hatty's duties to her male colleague, BI.  When Ms. Hatty returned from leave, Ms. Frost refused to reinstate Ms. Hatty to her former job responsibilities and constructively demoted her to an unspecified, mostly manual labor position, wherein Ms. Frost required Ms. Hatty to clean the office and picking up Ms. Frost's lunch.  When Ms. Hatty complained on the morning of June 3, 2020 that management had replaced her with BI, Ms. Frost and Dr. Hernandez immediately terminated her employment, and admitted doing so because of Ms. Hatty's complaint.  Because Ms. Frost was CI's long-time human resources manager, in light of both the content and context of Ms. Hatty's complaint, Ms. Frost actually knew that Ms. Hatty was lodging a protected complaint under the FMLA for interference of her rights to reinstatement, and Ms. Frost and Dr. Hernandez actually terminated Ms. Hatty in retaliation for making that complaint.

140.    Accordingly, CI is liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Ms. Hatty resulting from their unlawful interference of Ms. Hatty's FMLA rights and in retaliating against Ms. Hatty for lodging a protected complaint opposing that interference, including Ms. Hatty's lost back wages, lost front wages, interest, an additional award of liquidated damages in the amount of the lost wage award, other equitable relief including reinstatement or promotion, and plaintiff's reasonable attorney's fees and litigation costs incurred in the matter.  29 U.S.C. § 2617(a)(1) *et seq.*

## H.    Unlawful Failure to Pay Overtime Wages in Violation of the Fair Labor Standards Act against CI

141.    Ms. Hatty states a cause of action for unlawful failure to pay overtime wages against CI

under the Fair Labor Standards Act.

142.    Under the Fair Labor Standards Act, a covered employer is required to pay an hourly employee overtime wages at the rate of 1.5 times the employee's regular rate of pay for each hour over 40 worked in a weekly pay period.  29 U.S.C. § 207(a) *et seq.*  An employer who fails to pay an employee 1.5 times her regular rate of pay for each overtime hour worked owes the employee the lost value of these unpaid wages, doubled as liquidated damages unless the employer proves it acted in good faith.  *Black v. SettlePou, P.C.*, 732 F.3d 492, 501 (5th Cir. 2013) (citing 29 U.S.C. § 216(b) (regarding overtime wages specifically).

143.    Here, there is no question that CI is a covered employer under so-called "enterprise coverage" because Children's International took in more than $500,000 in revenue during the years of Ms. Hatty's employment.  Alternatively, Children's International is also a covered employer under so-called "individual coverage" because Ms. Hatty had "regular contact with [interstate] commerce, no matter how small[.]"  *Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.*, 474 F.3d 828, 829 (5th Cir. 2007).  Specifically, Ms. Hatty posted CI's marketing content to the Internet to be viewed by users inside and outside of Louisiana; Ms. Hatty telephoned vendors and other people related to her marketing and public relations work who were physically located outside of Louisiana; Ms. Hatty purchased goods and services from vendors outside Louisiana to be used at various CI public relations events; and Ms. Hatty accessed the Internet and computers outside Louisiana for the purpose of performing research, sending and receiving email, and carrying out her day to day responsibilities as a Marketing Associate and Director of Marketing and Public Relations.

144.    Alternatively, even had CI paid Ms. Hatty on a salary basis, Ms. Hatty was a non-exempt worker because, for at least during her employment after January 1, 2020, Ms. Hatty was not paid sufficient salary to be considered exempt; and, prior to January 1, 2020, Ms. Hatty did not perform

the sort of managerial or discretionary duties required to be considered exempt.  Specifically, while Ms. Hatty exercised significant skill attendant to her professional marketing and public relations duties, Ms. Hatty was not authorized to, and did not, create management policies at CI, affect CI's business operations to a substantial degree, commit CI to financial obligations without prior approval from management, deviate from existing CI policies without prior approval from management, and so on and so forth.  Likewise, CI decision-makers did not consider Ms. Hatty, either organizationally or practically, as a member of management or a person authorized to use discretion on matters of significant importance or concern to the business.

145.    At the time of termination Ms. Hatty was paid approximately $17.10 per hour and averaged at least five hours of overtime per week throughout her entire employment.  Nevertheless, CI failed to pay Ms. Hatty any wages whatsoever when she worked more than 40 hours in a week.

146.    Accordingly, based on these figures, CI owes Ms. Hatty unpaid overtime pay for approximately 111 work weeks, at five hours of overtime per week, for a total of 555 overtime hours, at the rate of 1.5 times Ms. Hatty's actual rate of pay for each hour of unpaid overtime.

147.    Finally, after Ms. Hatty was terminated, she contacted Ms. Frost and requested access to her weekly timecards on the Paylocity cloud-based platform to confirm exactly how many uncompensated overtime hours she had worked.  Ms. Frost eventually granted the access, but it was immediately obvious to Ms. Hatty that management (whether before or after her termination) has altered Ms. Hatty's pay records to reflect that she worked exactly 40 hours per week throughout her employment even though Ms. Hatty rarely (if ever) worked exactly 40 hours in a work week.

148.    Accordingly, upon information and belief, and based on the facts and circumstances as Ms. Hatty currently understands them, plaintiff asserts that management has purposefully spoliated Ms. Hatty's overtime pay evidence to prevent her from obtaining it in this case.  Under Fed. R. Civ. P.

37(e)(2), a defendant who intentionally destroys evidence to prevent the opposing party from obtaining it is liable for sanctions up to and including an adverse jury instruction or default judgment as a matter of law, and Ms. Hatty reserves her right to request that relief at the appropriate time in this case.

## JURY DEMAND

Ms. Hatty demands a trial by jury on all issues and causes of action in this matter.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Bridget Hatty prays that her complaint be deemed good and sufficient; that it summons be served upon defendant Children's International, L.L.C.; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant (1) declaring that defendant did intentionally fail to pay plaintiff the overtime wages she was due, and did discriminate and retaliate (as the case may be) against plaintiff based on her sex, protected complaints, and the exercise of her rights under Title VII, the LEDL, the Equal Pay Act, and the FMLA, (2) awarding plaintiff the legal relief she is due with respect to plaintiff's federal and state-law claims, up to and including lost back wages, lost front wages, compensatory damages, non-compensatory damages, reasonable attorney's fees, litigation costs, statutory damages and punitive damages under Title VII, liquidated damages and punitive damages under the EPA, and liquidated damages under the FMLA; and (3) all other legal and equitable relief to which plaintiff may be entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Counsel for Bridget Hatty*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**BRIDGET HATTY**

        **Plaintiff,**

    **v.**

**CHILDREN'S INTERNATIONAL, L.L.C.**

      **Defendant.**

**CIVIL ACTION NO. PENDING**

## <u>DECLARATION OF BRIDGET HATTY</u>

I, Bridget Hatty, am over the age of 18 years, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts and true and correct to the best of my knowledge and recollection:

1.     I am the named plaintiff in the lawsuit *Hatty v. Children's International, L.L.C..*, soon to be filed in the United States District Court for the Eastern District of Louisiana.

2.     I authorized my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter and to assert all of the causes of action included therein.

3.     I verify that, at the time of its filing, each allegation of the Complaint was true and correct to the best of my knowledge and recollection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.  Executed this March 25, 2021.

DocuSigned by:

*Bridget Hatty*

D93632F6AD7D49F

Bridget Hatty